# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **CHRISTOPHER K. MILGRIM,** ) | |
| Plaintiff ) | Civil Action No. 2:20cv00029 |
| ) | |
| v. ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] ) | |
| **Acting Commissioner of Social** ) | By: PAMELA MEADE SARGENT |
| **Security,** ) | United States Magistrate Judge |
| Defendant ) | |

*I. Background and Standard of Review*

Plaintiff, Christopher K. Milgrim, ("Milgrim"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

-1-

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Milgrim protectively filed his application for DIB[2] on March 5, 2019, alleging disability as of May 26, 2016, based on post-traumatic stress disorder, ("PTSD"); hearing loss; vision loss; back problems; right foot injury; type II diabetes; neuropathy in both feet; hypertension; high cholesterol; enlarged prostate; acid reflux; dizziness; anxiety; and depression. (Record, ("R."), at 11, 218-19, 258, 290.) The claim was denied initially and upon reconsideration. (R. at 126-28, 131-34.) Milgrim then requested a hearing before an administrative law judge,

---

[2] Milgrim previously filed DIB and supplemental security income, ("SSI") applications on January 31, 2013, alleging disability as of April 1, 2012. (R. at 73.) By decision dated May 25, 2016, the ALJ denied his claims. (R. at 73-88.) In accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999). Those standards have been superseded by 20 C.F.R. § 404.1520c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, *available at* http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Mar. 15, 2018) (explaining the categories of evidence).

The ALJ in this case noted she reviewed the previous May 2016 decision and found it to be "partially persuasive." (R. at 23, 73-88.) The ALJ noted Milgrim's physical condition could have changed, and the current record showed significant lumbar degeneration; therefore, she placed greater exertional limitations on Milgrim's work-related abilities than previously found. (R. at 23.)

("ALJ"). (R. at 135-36.) The ALJ held a hearing on April 2, 2020, at which Milgrim was represented by counsel. (R. at 37-69.)

By decision dated May 14, 2020, the ALJ denied Milgrim's claim. (R. at 11-25.) The ALJ found Milgrim met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 13.) The ALJ found Milgrim had not engaged in substantial gainful activity since May 26, 2016,[3] the alleged onset date. (R. at 13.) The ALJ determined Milgrim had severe impairments, namely obesity; diabetes with neuropathy; cervical spine degeneration; lumbar spine degeneration; right ankle tendon tear and surgery; hearing loss; history of carpal tunnel syndrome; major depressive disorder; generalized anxiety disorder; and PTSD, but she found Milgrim did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found Milgrim had the residual functional capacity to perform simple, repetitive, unskilled light[4] work, except he could not utilize foot controls with his right lower extremity, but could occasionally push/pull with his lower extremities; he could never crawl; he could frequently handle, feel and finger and reach overhead; he could occasionally climb ramps and stairs, balance, kneel, stoop and crouch; he must avoid concentrated exposure to extremely hot and cold temperatures and excess humidity; and he must avoid all exposure to hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds and vibrating surfaces. (R. at 17.)

---

[3] Therefore, Milgrim must show he was disabled between May 26, 2016, the alleged onset date, and May 14, 2020, the date of the ALJ's decision, to be eligible for benefits.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

The ALJ also found Milgrim was able to attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek; any time off task would be accommodated during normal breaks; he could have occasional to frequent interaction with co-workers and supervisors; he could respond appropriately to supervision, co-workers and usual work situations; and he could have no interaction with the general public. (R. at 17.) The ALJ further found Milgrim would require work with static duties that explained any changes made; that was not fast paced; that did not require him to work around excessively loud background noise; and that did not require him to drive. (R. at 17.) The ALJ found Milgrim was unable to perform any of his past work. (R. at 23.) Based on Milgrim's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Milgrim could perform, including the jobs of a non-postal mail clerk, an office clerk and a laundry sorter. (R. at 23-24.) Thus, the ALJ concluded Milgrim was not under a disability as defined by the Act from May 26, 2016, through the date of the decision, and he was not eligible for DIB benefits. (R. at 24-25.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued her decision, Milgrim pursued his administrative appeals, (R. at 214, 385-87), but the Appeals Council denied his request for review. (R. at 1-6.) Milgrim then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Milgrim's motion for summary judgment filed April 21, 2021, and the Commissioner's motion for summary judgment filed July 14, 2021.

*II. Facts* [5]

Milgrim was born in 1967, (R. at 42, 218), which, at the time of his alleged onset date, classified him as a "younger person" under 20 C.F.R. § 404.1563(c), and at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Milgrim has a high school education and specialized training in carpentry and welding; he has four years of military service; and past work experience as a welding machine operator and as a correctional officer. (R. at 41-45, 60, 259.) Milgrim was declared unemployable by the Department of Veterans Affairs, ("VA"), effective January 9, 2018, after being given a 70 percent disability rating based on PTSD. (R. at 331-36.) He testified he left his job as a corrections officer at Red Onion State Prison because he witnessed his brother, who also worked at the prison, "get stabbed 23 times." (R. at 49, 690.) Milgrim stated he had issues sleeping due to having nightmares about his brother being stabbed and about his time served in Desert Storm. (R. at 57.)

Barry Hensley, a vocational expert, also was present and testified at Milgrim's hearing. (R. at 58-66.) Hensley was asked to consider a hypothetical individual of Milgrim's age, education and work history, who had the residual functional capacity to perform simple, repetitive, unskilled light work, except he could not utilize foot controls with his right lower extremity; he could occasionally push/pull with his lower extremities; he could never crawl; he could frequently handle, feel and finger and reach overhead; he could occasionally climb ramps and stairs, balance, kneel, stoop and crouch; he must avoid concentrated exposure to temperature extremes and

---

[5] Milgrim's arguments on appeal are limited to the VA disability rating, which was based on Milgrim's PTSD, and the ALJ's findings related to his mental residual functional capacity. Therefore, the court will limit its discussion to those facts relevant to Milgrim's mental impairments and accompanying limitations.

excess humidity; and he must avoid all exposure to hazardous machinery, working at unprotected heights or on vibrating surfaces and climbing ladders, ropes or scaffolds. (R. at 60-61.) In addition, the hypothetical individual could attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer; he could complete a normal eight-hour workday and 40-hour workweek; any time off task would be accommodated during normal breaks; he could have occasional to frequent interaction with co-workers and supervisors; he could respond appropriately to supervision, co-workers and usual work situations; he could have no interaction with the general public; he would require work that was not fast-paced and with static duties, with any changes explained; and he could not work around excessively loud background noise or drive. (R. at 61.)  He stated the hypothetical individual could not perform Milgrim's past work, but a significant number of other jobs existed that such an individual could perform, including jobs as a non-postal mail clerk, an office helper and a laundry sorter. (R. at 61-62.)

Hensley was then asked to consider the same hypothetical individual, but who would be limited to standing and walking no more than two hours in an eight-hour workday. (R. at 62.) He stated such an individual would be unable to perform Milgrim's past work, but he could perform the previously identified jobs of non-postal mail clerk and officer helper,[6] in addition to the job of an order clerk. (R. at 63.) Hensley stated there would be no jobs available should the hypothetical individual be off task 11 to 21 percent of the workday. (R. at 63-64.) He stated the hypothetical individual's limitation to standing and walking two hours in an eight-hour workday and his restriction to lifting and carrying items weighing 10 pounds occasionally and five pounds frequently, would place him at the sedentary[7] level of

---

[6] Hensley testified these jobs would be classified as sedentary work. (R. at 63.)

[7] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined

exertion; however, his previous responses would remain the same. (R. at 64-65.) Hensley stated there would be no work available if the hypothetical individual could not generally relate on an ongoing, consistent and appropriate basis with supervisors and co-workers. (R. at 65.) He also stated there would be no work available if the individual could only occasionally handle, finger, feel and reach. (R. at 66.)

In rendering her decision, the ALJ reviewed records from Daniel Walter, Psy.D., a state agency psychologist; Dr. Thomas M. Phillips, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Wellmont Medical Associates; Melinda M. Fields, Ph.D., a licensed clinical psychologist; Russell County Medical Center; Bristol Regional Medical Center; Norton Community Hospital; Virginia Highlands Podiatry; and the VA.

On April 26, 2012, Milgrim was voluntarily admitted to Russell County Medical Center for suicidal and homicidal ideations following an incident at work. (R. at 695-720.) Milgrim reported anger, frustration and irritability after witnessing his brother being stabbed by an inmate. (R. at 695.) He stated he believed he "would go off on the inmate" if he returned to work. (R. at 695.) Milgrim was diagnosed with acute stress disorder; PTSD; and sleep apnea. (R. at 696.)

On July 17, 2018, Milgrim presented to the emergency department at Norton Community Hospital for depression and suicidal ideation. (R. at 743-54.) He denied then-current suicidal or homicidal ideation and reported his last thoughts of suicide were more than four weeks previously. (R. at 746.) Milgrim's thought process was

---

as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

logical; his insight was good; he had intact memory; his judgment was within normal limits; and his affect and mood were appropriate. (R. at 747.) An electrocardiogram, ("EKG"), was normal, and chest x-rays showed no acute cardiopulmonary disease. (R. at 743, 752.) Milgrim was diagnosed with depression and discharged home in stable condition. (R. at 747.)

On June 20, 2019, Melinda M. Fields, Ph.D., a licensed clinical psychologist, evaluated Milgrim at the request of Disability Determination Services. (R. at 689-93.) Milgrim reported he spent his time watching television and completing household chores, and he played bass in a gospel group at various churches.[8] (R. at 690.) Fields reported Milgrim's posture and gait were normal; his hygiene and grooming were good; he experienced difficulty with auditory acuity; he was cooperative; he did not experience difficulty comprehending questions; he made adequate eye contact; his stream of thought was organized and logical; his thought content displayed no evidence of impairment; his mood was depressed; his affect was blunted; he was unable to recall any of four words after a delay; his remote recall was impaired; his judgment and insight were adequate; his persistence was normal; and his pace was very slow. (R. at 689, 692.) Fields diagnosed PTSD; major depressive disorder, recurrent, severe, without psychotic features; and generalized anxiety disorder. (R. at 693.) She opined Milgrim would unlikely complete a typical workweek without presentation of psychiatric symptoms and successfully navigate work stressors, including the need to interact appropriately, on a regular basis, with supervisors, co-workers or the general public. (R. at 693.)

---

[8] Milgrim stated he had been hospitalized after he attempted to hang himself during his second marriage. (R. at 690-91.) He also stated his second wife filed a domestic violence petition against him but later dropped it. (R. at 691.) The record does not contain any evidence related to this hospitalization.

On June 24, 2019, Daniel Walter, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Milgrim suffered from severe trauma- and stressor-related disorders; anxiety and obsessive-compulsive disorders; and depressive, bipolar and related disorders. (R. at 95-96.) He opined Milgrim had moderate limitations on his ability to understand, remember and apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 95.)

That same day, Walter completed a mental assessment, indicating Milgrim had moderate limitations in his ability to remember locations and work-like procedures; to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 100-02.) Walter stated Milgrim's work-related mental abilities were, otherwise, not significantly limited. (R. at 100-02.) Walter opined Milgrim had the residual functional capacity to understand, remember and carry out simple instructions in repetitive, unskilled work that involved occasional interactions with the general public, co-workers and supervisors. (R. at 102.) He found Milgrim could respond appropriately to supervision, co-workers and usual work situations. (R. at 102.)

On September 23, 2019, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, indicating Milgrim suffered from severe trauma- and stressor-related disorders; anxiety and obsessive-compulsive disorders; and depressive, bipolar and related disorders. (R. at 113-14.) He opined Milgrim had moderate limitations on his ability to understand, remember and apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 114.)

That same day, Leizer also completed a mental assessment, indicating Milgrim had moderate limitations in his ability to remember locations and work-like procedures; to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 119-21.) Leizer stated Milgrim's work-related mental abilities were, otherwise, not significantly limited. (R. at 119-20.) Leizer opined Milgrim had the residual functional capacity to understand, remember and carry out simple instructions in repetitive, unskilled work that involved occasional interactions with the general public, co-workers and supervisors. (R. at 120.) He found Milgrim could respond appropriately to supervision, co-workers and usual work situations. (R. at 120.)

On March 11, 2020, Milgrim was seen at the VA for mental health medication management. (R. at 1023-26.) He complained of insomnia related to grieving over the passing of his mother and his dog. (R. at 1023.) He also complained of nightmares. (R. at 1023.) Milgrim was dressed appropriately; he had adequate personal hygiene; his gait was steady with no tremors or rigidity; he made appropriate eye contact; his mood was dysphoric in the context of the recent loss of his mother and his dog; his affect was broad and congruent; his speech was spontaneous and of normal rate, rhythm and volume; his thought processes were logical and goal-directed; he denied suicidal and homicidal ideations; his recent, remote and immediate recall were intact; and his judgment and insight were intact. (R. at 1024.) Milgrim was diagnosed with chronic PTSD; generalized anxiety disorder; and tobacco use disorder, continuous. (R. at 1025.) He was continued on multiple medications. (R. at 1025.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Milgrim argues the ALJ erred by failing to give appropriate weight to his VA disability rating. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Milgrim argues the ALJ erred by improperly determining his residual functional capacity by failing to give full consideration to Fields's opinion and by giving controlling weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 5-6.) Milgrim contends the state agency psychologists' assessments were "stale [and] outdated." (Plaintiff's Brief at 5-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the

record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[9]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

---

[9] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[10] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how she considered each of them. Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly

---

[10] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Milgrim argues the ALJ erred by failing to give appropriate weight to his VA disability rating.[11] (Plaintiff's Brief at 4-5.) Under the revised rules previously discussed, an ALJ "will not provide any analysis" about a decision made by any other government agency or nongovernment entity about whether a claimant is disabled. 20 C.F.R. §§ 404.1504 (2020), 404.1520b(c)(1) (2020) (instructing that decisions by other governmental agencies are "inherently neither valuable nor persuasive"). Based on this, I find the ALJ was not required to analyze Milgrim's VA disability rating or give it substantial consideration. Moreover, consistent with the above regulations, I find the ALJ appropriately considered evidence from the VA submitted by Milgrim in support of his DIB claim. *See* 20 C.F.R. § 404.1504 (supporting evidence underlying other governmental agency's disability decision received as evidence from a claimant will be considered).

Milgrim argues the ALJ erred by improperly determining his residual functional capacity by failing to give full consideration to Fields's opinion and by giving controlling weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 5-6.) The ALJ found Milgrim had the residual functional capacity to perform a limited range of simple, repetitive, unskilled light work. (R. at 17.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2020). In making her

---

[11] As noted above, effective January 9, 2018, Milgrim was declared unemployable after being given a 70 percent disability rating based on PTSD. (R. at 331-36.)

residual functional capacity finding, the ALJ stated she found Fields's opinion "not persuasive." (R. at 22.) Fields performed a one-time evaluation and opined Milgrim would not be able to complete a typical workweek without psychiatric symptoms and that it was unlikely he would successfully navigate stressors typically encountered in gainful employment, including the need to interact appropriately with supervisors, co-workers or the general public. (R. at 693.) The ALJ found this opinion was "not strongly supported by [Fields's own] examination," and it was "not consistent" with treating visits, which failed to show significant abnormalities. (R. at 22.)

The ALJ explained Fields's opinion was vague and did not provide specific limitations. (R. at 21.) Specifically, the ALJ noted that Fields did not account for the possibility of social interaction limitations. (R. at 21.) Although Milgrim reported social anxiety with crowds, he was able to perform in a gospel group at various churches and shop with his wife, if there were not too many people in the store. (R. at 690.) Nonetheless, Fields opined Milgrim unlikely would have the capacity to navigate stressors, including the need to interact appropriately on a regular basis with supervisors, co-workers and the public. (R. at 693.) The ALJ found the record failed to indicate such significant anxiety. (R. at 22.) Based on Milgrim's reported social anxiety, the ALJ limited him to frequent interactions with co-workers and no interaction with the general public. (R. at 22.) While Fields opined Milgrim would be unable to successfully navigate work stressors, the ALJ limited him to simple, repetitive, unskilled work. (R. at 17, 693.) The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (2020); *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration.").

The ALJ noted, although Fields found Milgrim was depressed during the evaluation and had a slow pace, she found the record did not show Milgrim sought regular mental health treatment, and his treating providers "did not note great psychological abnormalities." (R. at 22, 692.) There is minimal evidence in the record concerning Milgrim's PTSD, depression and anxiety, and there is no evidence Milgrim sought therapy or counseling. However, Milgrim's treating physicians routinely reported that Milgrim was pleasant and cooperative; he had good hygiene and grooming; he made adequate eye contact; his thought process was logical and goal directed; his recent, remote and immediate recall were intact; his judgment and insight were intact; and he had normal persistence. (R. at 397, 400, 403-04, 677, 689, 692, 1024, 1056.) Based on this, I find there is substantial evidence to support the ALJ's consideration of Fields's opinion.

The ALJ found the opinions of the state agency psychologists, Walter and Leizer, "persuasive." (R. at 22, 95-96, 100-02, 113-14, 119-21.) Walter and Leizer opined Milgrim had the residual functional capacity to understand, remember and carry out simple instructions in repetitive, unskilled work that involved occasional interactions with the general public, co-workers and supervisors. (R. at 102, 120.) They found Milgrim could respond appropriately to supervision, co-workers and usual work situations. (R. at 102, 120.) While the ALJ found these opinions largely "persuasive," the ALJ found their finding that Milgrim could occasionally interact with the general public inconsistent with the evidence showing he would have significant difficulty dealing with the public. (R. at 22.) Thus, the ALJ found Milgrim could have no interaction with the public. (R. at 17.) Based on this, I find there is substantial evidence to support the ALJ's consideration of Walter and Leizer's opinions.

Based on the above, I find substantial evidence exists to support the ALJ's consideration of the opinion evidence and her residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Milgrim was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Milgrim's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed

findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:   November 30, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE